OPINION OF THE COURT — BY
CHIEF JUSTICE HAMPTON.
This cause was first instituted in the superior court of law and equity, for Wilkinson County, where the bill was filed on the 18th of October, 1813. It was subsequently, at the November Term of said court in 1815, transferred by consent of parties to Adams county, where, at a superior court, November Term, 1820, it was transferred to the supreme court on doubts of the judge, At the December Term of this court in 1821, an issue was directed, after previous argument, to the Adams superior court', to try the question of voluntary abandonment on the part of R. Stark, the ancestor, which issue, at the May Term 1823, of said court was found for complainants; at the last June Term of this court, a rear-gument was ordered, which we have had the pleasure of witnessing at the present session, conducted with great zeal and ability on both sides. It now devolves upon us to express the opinion which we have formed, af *182 tor the most careful and patient investigation, but which is yet advanced' under the great difficulties of the subject and the discouragement of a dis-senient voice among ourselves, which diminishes 'the confidence with; which it is entertained.
The statements of the bill are: — That sometime in 1791, Robert Stark, the ancestor, obtained from the Governor General of the province of Louisiana, Estevan Miro, a warrant, or order of survey, for 2000 acres of land, square measure, on Bayou Sarah, in the then Natchez district, now in Wilkinson county of this State — which warrant, and evidences of actual survey in pursuance thereof, by William Dunbar, deputy surveyor, of said district, and the petition of their said ancestor therefor, are in possession of complainants, ready to be produced. That then said ancestor was put into possession of said tract of land by the proper authorities, con-formably to the instructions and requirements contained in said warrant of survey, and complied on his part with all the conditions of cession, continued for several years in possession, made extensive clearings, raised several crops, paid the fees of surveying and made the necessary advances for perfecting the title by patent. Some time after which settlement, their said ancestor not satisfied with the situation of said tract, proposed to Governor Gayozo, to relinquish said tract of land, on express condition, that he should receive in exchange therefor from the Governor, another tract equal in value which he might select. But the said Governor, without complying with said conditions, from a personal dislike to their said ancestor, offered his said tract óf land to one James Mather, to whom it was immediately afterwards, in 1794, granted, and who took possession of the same, together with farming utensils and a crop of corn then growing; against which arbitrary conduct of the said Governor, and fraudulent practice of said James Mather, their said ancestor protested as unlawful.. That the said James Mather, who had a perfect knowledge of the title of said ancestor of complainants to the said tract of land, obtained a grant therefor, entirely through the influence of said title, and the false and fraudulent representations of William Dtmbar and other officers of the Spanish Government who were urged and excited thereto by the said James Mather. In part evidence whereof, complainants have now in possession a memorandum in the hand writing of the said William Dun *183 bar, at the foot of the original warrant, or order of survey, purporting to be a sale and release of the said 2000 acres, to the said William Dunbar, and to have been subscribed by the said ancester of complainants. The said warrant dr order of survey had been in the possession of the said William Dunbar, and when delivered to the said R. Stark, which was after the grant to Mather, it had the memorandum mentioned, but so obliterated, apparently by design, as to be but partially legible.
The bill further states, that according to the laws, usages and customs of the Spanish government, a Spanish warrant, or order of survey, was considered as equivalent to a complete grant, by which on the fulfilment of the conditions imposed, a fee simple passed to the warrantee, and that the government never regranted the lands so conveyed, unless the same became forfeited to the crown, or by consent of the first grantee, and in latter days the Spanish government, was not in the habit of exacting of their grantees many of the conditions annexed to the early grants, and no transfers of rights thus acquired were valid, unless the same were in writing and duly recorded. They deny that their ancestor ever committed any act by which a forfeiture of his right to the said tract of land resulted to the government or ever disposed of the same to any person whatever, or gave his consent either verbally or in writing to the proper authorities, to regrant the same, but that by confederation, &c> the said James Mather, obtained and kept possession of the same, and refuses to account for the 'corn and implements of husbandry, acquired therewith. The prayer is for a surrender of the land, its titles, peaceable enjoyment thereof, and for general relief. The answer of James Mather admits the acquisition of the order of survey,its execution and possession of the ceded premises under if, by ancestor of complainants, but denies his having made either early or extensive improvements thereon, and professes ignorance as to fees paid for survey and monies advanced for perfection of title. Alleges, that sometime in 1792, respondent desiring to acqure a tract of land in the Natchez district, made application to Governor Gayoso, then Governor of said district, who informed him that the tract of land now in question, was vacant, and that the concession would be made to him on his petitioning therefor. Respondent having understood that said R. Stark, the ancestor of complainants, had resided on stud tract for a short time, enquired of *184 the said Governor, if he had no claim thereto, or expectation of holding it-, When the said Governor informed respondent, that he the said R. Stark had abandonedand given up his claim to it. Respondent then enquired of the said R. Stark, being at the house of the Governor at that time, if he had any1 claim to the said tract of land, who answered in the negative, that he had abandoned it, and should quit the Country, and that this respondent was at full liberty to apply therefor.
Whereupon defendant petitioned for said tract of land, and obtained, an Order of survey therefor from the Governor, of the then province of Louisiana, dated 7th of February, 1793, and the same was actually surveyed for defendant by . William Dunbar, the deputy surveyor, on the 20th of July, in the same year-, and the defendant invested with possession, and about the 3d of April, 1794, a patent issued for the said premises to respondent, under theseal of the Governor of said province, to whom the granting of lands therein pertained. ‘ That during the whole of this ‘time, while respondent was'perfecting his title as aforesaid, the said R.' Stark, the ancestor of complainants, made no claim or pretence of claim to the .same. That at the time of purchasing said titles to said tract of land-, this respondent had no notice of any otlier claim thereto, but was assured by the said R, Stark, that he had none. On which respondent insists, the same as if it were pleaded. Respondent further answering, denies that when the .said R. Stark, relinquished and abandoned his claim as aforesaid, he made any reservations or conditions with the Governor, or commandant of said district of Natchez, by which he was to have other lands in lieu of those thus abandoned, but that said abandonment, was for the purpose of quitting the country, which the said R. Stark, did do immediately thereafter, without having made any application for other lands in the Spanish ■dominions; and respondent believes that when the said R. Stark thus abandoned his land and the Spanish country, the said order or warrant of ■survey was left ,in the hands of the said deputy surveyor, and did not again come into possession of the said Ri Stark, until his return to the country, after a change of government, after which the said R. Stark, instituted his action of ejectment, against the tenant of respondent, in the district court, for the district of Adams, to which action defendant made defence, and permitted the said R. Slark to give all matters in evidence, as *185 Veil in parol as in deed, touching his said title, and after full examina’tion of both the legal and equitable titles of both parties, a verdict Vas rendered for defendant. Denies taking possession of the crop, or any ■other property of said R. Stark; denies all collusion with said William Dunbar, nor does he believe said William Dunbar ever practised any fraud or designs against the said R. Stark, in relation to said land. That on the 26th of April, 1803, respondent sold and conveyed said tract of land, in fee simple, to George Mather, now deceased, for full consideration paid in money and services, by the said George Mather, in his lifetime. That this defendant, and said George Mather, in his lifetime, and those claiming under him, since his death, have been in possession of said premises, more than 20 years, occupying, cultivating and im-proveing the same, on Vhich he insists as if plead. Denies all fraud, combination, &e. and usual prayer for dismission with costs, &c.
The amended bill charges, that George Mather, Junr. who is made party defendant, pretends that James Mather, father of said George Mather, conveyed the said premises to George Mather, senior, brother of him the said James Mather, and he the said George Mather, sen. devised to him ■the said George Mather junr. But they expressly charge, that if such conveyance was made, the same is a fraud of complainants, for they say it was a matter of public notoriety, not only in the family of him, the said George Maiher, but also in the neighborhood, that the said R. Stark, the ancestor, in his lifetime, and his heirs since his death, claimed title to the Said tract of land, of which the said George Mather,'senior, brother of the said James Mather, and the said George Mather, junr. another defendant, had notice before any conveyance or devise as is pretended to have been made, was made. Prayer as in original bill, and for’conveyance from the said George Mather, junr. to the complainants of the said premises, and for general relief.
The plea of George Mather, junr. states that George Mather, senr. was a purchaser for valuable consideration, ot his brother, James Mather, without notice, and devised said premises to him, the said George Mather, junr. defendant.
Complainants title consists in the petition of their ancestor, Robert Stark, for the land in question, dated 20th of September, 1791, accom *186 panied by ah address from Governor Gayoso to the Governor and Intern dant General ofthe province of Louisiana, dated on the 1st of October* 1791, recommending to his excellency the pretensions of the said Stark, and the warrant or possessory order of siiiv'ey from the said Governor General, to the surveyor general, Trudeaux, dated the 29th of December, 1791, under which it is an evidence, that the said R. Stark, the ancestor* was invested with possession of the said tract of land, the same being duly laid off and surveyed for his benefit, and that he remained in possession for several years, improving and cultivating the same, having paid the fees for survey, and the further fees for the perfection of title Whatever right to the contested premises were raised by this State of facts in favor ofthe ancestor, R. Stark, if not subsequently affected the present complainants succeeded to as heirs, by virtue of that succession, now ask relief at the hands of this court. Defendant’s title consists in a warrant of survey for the contested premises, in favor of James Mather, dated 7th of February, 1793 — survey made in pursuance thereof, on the 20th of July, of the 'samé year, the certificate whereof returned into the office of the Governor General of the province of Louisiana, dated 2d of April, 1794, on which a patent emanated from said office, bearing date the 3d of April, 1794. A deed from James Mather, to his brother, George Mather, senior, of the said premises on the consideration* expressed of ten thousand dollars, dated 26th of April, 1803, filed and recorded in the office of the clerk of the county court of Wilkinson, where the land lies, on the 13th of November, 1815, and in the register’s office, west of Pearl River, on the 31st of March, 1804. The will of G. Mather, senr. uncle of G. Mather, jr. the present defendant, bearing date the 7 th of Nov. 1803, containing abequest of the premises to him the said defendant, and certificate of confirmation of the board of commissioners, bearing date the 20th of April, 1806, in favor of the said George Mather, jur. the present defendant* Under which, defendant and those from whom he derives title, have enjoyed long and uninterrupted possession, not however, acquiesed in by complainants, and their ancestor -evidenced by an action of ejectment instituted in the Adams district court, by R. Stark, the ancestor, against James Mather, in which verdict was fordefendantj-aad the institution of this suit by complainants, the heirs of *187 the said R. Stark, on the equity side of the superior court of Wilkinson, in 1813.
If the foundation be sound and good, the superstructure of this title, so regular and complete in all its parts, presents a very imposing aspect.
It may be well to dispose of some preliminary points, which, tho’ they occupied a distinguished place in the able discussion at the bar, do not present to the court, from the view, which, after great reflection, they have taken of the merits of this case, matters of much difficulty. Few occasions have elicited greater and happier exertions on the part of the counsel of defendant, than the discussion of the question, how far Spain at the time of the respective cessions of the matter in controversy, had a right to grant lands lying between the 31st degree of north latitude and the mouth of the Yazoo River. We do not, however, consider the discussion of that question as an indispensable measure to the attainment of the ends of justice in the case under consideration. If we did, the argument and authorities advanced by the counsel, and the very able opiniqn of the judge of the district court of the United States, to which we have had access, would have their due weight, with us. If the matter in controversy was between a patentee of the Spanish Government and, the Government of the United States, the decision of that question would be unavoidable. Admitting in the abstract that Spain had no such authority, yet the argument is not satisfactory, which considers the acts of. the Spanish Government void, as to, the rights and claims of both parties litigant, and that the first origin of legitimate right, is to be found in the confirmation of Mathers’ claim, by the American board of commissioners, conformably to the provisions and stipulations contained in the .articles of agreement and cession-between Georgia and the United States_For equity will certainly rejflectthe gracious complacency which these provisions and stipulations, throw over the acts of the Spanish Government, by which they are .redeemed from the reproach of tort feasons, so far as to effectuate the results of immutable justice. She will enquire into the fair claims of those who set up pretensions under this^act of munificience, (if you please,) and impart the bene-fiit to him, for whom in good faith it was^intended.
Thoughitbe admitted that the finding.of the jury is not conclusive upon as, in accordance to the principles recognised 1 chancery cases 508, still-, *188 on a careful examination of the evidence, we are satisfied with the ver-, diet, and shall consider the question of voluntary abandonment, as put at rest by it. Where the evidence is contradictory, it is the province of the jury to judge of its weight. The evidence which would lead to a different conclusion to that drawn by the jury, relates mostly to expressions and conduct of R. Stark, the ancestor, after the misunderstanding had occurred between him and Governor Gayoso, when his mind was either under the-irritation and excitement produced by that event, or discouraged by the impending storm of arbitrary power which it presaged. The evidence. should be very conclusive to produce a satisfactory conviction that a man,. who had, at a great expense, migrated with a large family, to this fertile. country, and settled and improved a valuable landed property, in it, had voluntarily, and without any reasonable cause moving him thereto, aban-, doned and-forsaken both'. Asfo' the question of notice, George Mather Junr. tfie present defendant,' thofigh he stands in relation to him of whom he derives title, in the character of a volunteer, yet, if his uncle, George-Mather Senr. who bequeathed to him the property in controversy, was a purchaser thereoffor valuable consideration, without notice, it may be admitted, as is laid down in some of the books, that as a volunteer, he may protect himself by this equity in his division, and occupy the same favor-, able attitude of his uncle, a purchaser for valuable consideration without notice. But the evidence of Joseph Vidal,Eleazer Rees,Joseph Williams, and George Hart sufficiently proves that George Mather Senr. at the time of the purchase from his brother James, had notice of R. Stark’s claim. — ■ He, therefore, cannot be considered in the character of a purchaser for valuable consideration without notice. The consequence is, therefore, that George Mather Junr, the present defendant, cannot have stronger claims, in reference to Stark’s rights, to the litigated premises, upon the consideration of the court, than those of a volunteer, or a purchaser, with due notice of this out standing equity.
As it respects the trial of ejectment, in the Adams district court, some years since, it is sufficient to remark that the evidence of the presiding judge satisfactorily evinces, that tho’ the matter went to a jury, yet that the recovery was had for the defendant, chiefly on the ground of his being deem-, erl a superior legal title, or that the title exhibited by the plaintiff^ was not *189 deemed a paramount legal title, sufficient to justify the eviction in that form of action, of defendant from the controverted premises. Having disposed of these preliminary points, we shall proceed to examine the two principal questions, in our estimation, involved- in the present controversy, which we shall consider together in the conclusion.
1st. What is the fair construction of the provisions and stipulations contained in the articles of agreement and cession between the United States and Georgia, and the several acts of Congress passed in pursuance thereof, and how far such a construction bears on the case before us.
2d. What are the powers of a court of chancery to grant relief, such as is sought by the present complainants? By the second clause of the first article, in the said stipulations between Georgia and the United States, it is provided, “That all persons, who on the 27th day of October, 1795, were actual settlers within the territory confirmed in all the grants, legally and fully exe¿ata^.]^rí3r by the former British government of West Floricm, or try thegovernmint of Spain, and in claims by virtue of any actual s¿xt^^¥nd^yli!liQífí Vnade under the Georgia Bourbon Act. By virtue of this section the American commissioners, gave to the defendant a cev^^arg'of1 cmiirmaWQ, he having ex> hibited- his perfect Spanish title, anff^áwcqgcgajaffevidence of actual residence on the said 27th day of October, 1795. The United States having accepted of the cession upon the conditions hereby imposed, divested themselves of all discretionary power in regard to claims thus protected by the convention of Georgia. As to grants of this description, made either by England or Spain, their authority, so far as respects the vested rights in the grantees, is expressly recognized by Georgia, and the United States not the abstract creation or origination of right, but the. recognition of subsisting rights, in reference to acts of other govern-, ments. By the first section of an act of Congress, passed 3d of March,, 1803, it is enacted, “That any person or persons, or the legal representatives of any person or persons, who were resident in the Mississippi territory on the 27th day of October, 1795, and who had prior to that day obtained, either from the British government of'West Florida, or from the Spanish government, any warrant or order of survey for lands lying within the said territory, to which the Indian title had been extinguished, and. *190 which were on that day actually inhabited and cultivated by such person-, or persons or for his or their use, shall be confirmed in their claims to such lands in the same manner as if their titles had been completed, if granted as the true head of a family or over the age of twenty-one years.” Here again we perceive an obvious reference to the acts of the British and Spanish governments, as the basis of the recognition of rights, of such claims as fall within the provisions of this Congressional confirmation of right. Now, who can question that if R. Stark, the ancestor of complainants, had not fled from the gathering storm of incensed power, but had remained in peaceable possession of his improvements, or with his order or warrant of survey in his pocket, a tenant in possession, he had been a resident of the territory on the 27th of October, 1795, even though he had not received a patent for which he had paid the customary fees of office, yet either that his claim would have been preferred, to that of defendant by the Board of commissioners, or that would have happened, which occurred in the case of Cole’s heirs, the government of the United States would have granted a patent on the production of such evidence though the other claim had been preferred by their commissioners'! Shall therefore, the base absence of these parties of necessity and not of choice, held by us to defeat a right founded in justice and equity, and which had .actually vested in him, and had never in any legitimate way, by any competent authority been vacated or annulled. We think not. It would be to make this court the hand-maid to oppression — a chancery to consecrate the wrongs and enormities of licentious power. In the case of George Winn vs." Cole’s heirs, decided at the adjourned January term, 1823, this court held, i(That the possessory order in favor of James Cole, to the premises in question, dated 6th of June, 1795, by which said Cole was put into possession, vested in him such a right as could only be defeated by his own act of alienation, voluntary abandonment or by such an entire failure of the conditions of the grant, or by some act against the government which would justify in them its confiscation.” In regard to the first, there is not in this, as there was not in that case any pretence set up. In that case it was not pretended that there was, and in this the jury have expressly found that there was nota voluntary abandonment, and in neither case is it alleged that there were any rebellious or treasonable practices *191 olí the part of the grantees to justify the Spanish government in the revocation or confiscation óf its grant or order of possession. But in this case it is not pretended, as it was in that of Cole’s heirs, that there was a failure of the performance of the conditions of the grant. The court having determined in that case, that there was not such failure of the conditions, places the two cases substantially in these features of them wholly 'analogous. The language held by the court in that case,, in regard to the 'revocation or confiscation of the first grant, applies in substance with equal force to the facts in the present. “That there is no express declaration of the Spanish government, that such a confiscation or revocation 'for good and sufficient causes, therein expressed, was ever made nór any declaration, unless it be found in the formal expressions as to the possession being vacant to be met with in the subsequent title, which amounts to nothing more than the language employed in the cession of all unappropriated lands, and by no means import a judicial investigation and decision on the part of the competent authorities of the government, by which the vested rights, of one citizen or subject are withdrawn aud transferred to another, for it would he presuming too much against the justice of any government to attribute to it> the usé of no more solemnity in the abduction of a vested right of one of its subjects, than it employs in the ordinary transfer of its own unappropriated domain.” In the absence of a record' of a judicial or official revocation or confiscation of the grant to R. Stark, the ancestor of complainants, for good causes moving the government thereto such as before stated, viz: failure to fulfil the conditions of the grant, or some act of treasonable or rebelious practices, against the government, in case where it is not pretended there was an alienation of right, and the jury has expressly found, that there was not a voluntary abandonment of it, the regranting of the subject matter of such right to another person, shall be deemed the result of mistake, or if the second grantee had due notice of the prior claim, the procurement of false representations and fraudulent practices on his part, or the effect of lawless pow-er in the governor, unsupported by reason or justice, and not to be upheld by a decree of that tribunal, which hath no help for fraud or oppression, whatever, therefore, may have produced another grant of the same premises, before the first grantee had been legally divested, such a subsequent *192 grant, cán convey no right or property in the premises, to the prejudice of the subsisting rights of the first grantee, and he who occupies the controverted premises, by virtue of such a subsequent grant, though he be ushered in under the panoply of a full and complete legal title, and be supported in his possession by the strong arm of power, shall nevertheless* after that domination ceases, be decreed by courts* exempted from its influence, to hold and possess as trustee for him, so unjustly evicted. Such is the character of defendant, and those from whom he derives title in reference to complainant’s ancestor, and this character having attached prior to the date of the articles of agreement and cession between Georgia and the United States, it shall not be varied by any of their provisions, but receive the benefits they confer, to the uSe of those for whom they stood seized, as trustees. Neither do we consider that the removal of R. Stark, the ancestor of complainant’s, after this character of the trustees, did in the estimation of equity, attach to James Mather, as at all varying the responsibility of said trustee, or as defeating the right of the said R. Stark to succeed, to the enjoyment of his property, as early as its restoration should be awarded by a proper tribunal. If the possession of James Mather was, as it certainly was in our estimation, virtually the possession of Robert Stark, the ancestor, there the absence of the ■ latter, on the 27th day of October, 1795, shall not defeat his claim, we ¡are inclined to think that such would be our opinion even in a case where the contest had been wholly between two citizens, when the weaker with the better right, was overborne by the stronger, and under such discouragements, voluntarily left the country, but surely in a case where a man flies from the strong arm of power, he shall not forfeit any right thereby.
The power of the courts to scrutinise into the ttue character of titles, tho’ consecrated by a certificate of confirmation or patent, has not been called in question. For congress having expressly reserved theright'of a judicial investigation, to those whose claims were repudiated, even against the pat-entees of the government, for valuable pecuniary consideration, cannot be supposed to have witheld it, in relation to patentees by courtesy, or such by virtue of a consideration supposed to have passed to a former government.The provisions in the articles of agreement and cession between Georgia and the United States, and in the several acts of congress in relation to this *193 subject, were designed to settle claims between the government, and not to extend to the conflicting claims of individuals, which were left for final adjustment to the tribunals of justice. In regard to the present' controversy, we have been appealed to for its decision, and ave of opinion that justice and equity demand, at our hands the effectuation of complainant’s rights, so long and so unrighteously usurped. That the patent from the Spanish government to James Mather, and the confirmatory certificate of the American board of commissioners to George Mather junr. ought in good ■ faith, on the part of the former, and of right on the part of the latter, to have been awarded to R. Stark and his heirs, and that in principle the present is strongly analogous to the case ini. Sargent and Rawles, Rep. 20S ; where Tilghman, chief justice, speaking of a patent erroneously obtained, 'says: “ The officers of the commonwealth are to give the patent to him who is entitled to it, and if they give it to any other person, that person is ' no more than a trustee for him who has the right. This is the settled law 'in our courts, and the courts of the United States adopted the same princr-ciplein Hordikepper’s lessee, vs. Douglas.”
Note. — It ig much to be lamented, that no notes have been preserved of the arguments of counsel in this important case. The opinion of the courtis certainly able and eloquent; out with every feeling of respectful deferenco, it seems difficult to perceive, how the defendant could be decreed to stand towards the complainant, in the relation of a trustee.
The grant oithe Spanish government conferred no title on Robert Stark, according to the principles now settled by the supreme court of the United States. Nor was this title embraced within the provisions of the articles of agieement and cession between Georgia and the United States. The title, was not “Jegailyand fully executed,” according to the provisions of that compact, even if Stark could be viewed as a settler within the meaning of the articles. Were Stark, however, viewed as embraced within the provision of theso articles, or of any act of Congress,' his*title would have been forfeited for want of proper presentation to the board of commissioners as required by law. The title of Stark then, was a mere nullity, that of Rlather was a complete legal title, being embraced within tho articles of cession, and confhmedby the United States. How then could Mather be viewed as a trus-. tee for Stark? He did not hold under Starts title} for that was a nullity, but by a distinct title of his own, unconnected with that of Stark, embraced within the provisions of the compact with Georgia, and confirmed by the United Stales. He who holds the legal title may be decreed to stand a# trustee for the person holding the equitable title, but Stark never held any valid title, legal or equitable. What avails it even if the Spanish Government could not revoke their grant, if that grant was a nullity. If Mather had taken possession under tho title of Stark, and procured a confirmation of .that title in his own name, the question might bo different;, but he took and held possession by a title wholly distinct from and directly adverse to that of Stark, which adversary title was confiimed by the United States. This confirmation might by the reliospcctive energy of the compact with Georgia relate to the Spanish grant to Mather so as to give it a legal existence; but that would only operate to rendervalid the Spanish title to Mather, winch title was directly contradictory to, and destructive of the title of Stark. The cases in which a patentee is directed to hold the title as trustee for an-other person, are when that person and the patonteo hold under the same original title, and the officers of government in obedience to the law, should have givao the patent to such person and not to1 the patentee. ‘Courts cannot create titles, and Stark never hold any valid title. The oiheevs government cannot create titles, and had they given a patent to Stark, they would have disobeyed, the laws, which alone can vest the title, and the patent would have been invalid. But it is said that the actofthe Spanish government in revoking the grant to Stark, and granting the same lands to Mather, was a lawless act of arbitrary power, and that Mather participated in the misconduct of the ‘Spanish government, in other words that the Spanish government should have completed the title of Stark, and that congress should have confirmed his title, and therefore that the court will do what, in their opinion, should have been done by the governments of Spain and of the United States. And are the courts of this country competent to vest a title in an individual who never had any valid title, legal or equitable; and are they also competent to divest a complete legal and equitable title, created by the only power which can dispose of the public domain? If the Spanish government acted unjustly in granting a title to Mather, and the Congress of the United States participated iu that injustice, in confirming that title, the judicial tribunals are not competent to correct the errors of the government, so long as the constitution is not violated by any legislative enactment. Stark having no valid titlo, legal or equitable, Congress, the only competent power to dispose of the public domain, vested a title in Mather. In doing so, no provision oftlie constitution was violated, and the justice or propriety of the act does not come within the sphere of judicial enquiry, otherwise the -courts ave omnipotent, and may repeal or disregard any legislative enactment which appears to them inexpedient or unwise.
*193 We are of opinion that defendant should deliver up the premises to the complainants, and convey to them all his right and title, and pay the costs of suit.
Judge Ellis concurred.
Judge Stockton dissented.
Mather’s title being embraced within the treaty with Georgia, and the acts of Congress carrying that treaty into effect, was itself protected by the constitution, which makes a treaty the supreme law of the land.
Mather is'said by the court to have held possession, in contemplation of law, as trustee for Stark. If so, the statute of limitations, which does not run as between trustee and cestui que trubt, would never have given Mather a title, yet his possession was clearly adverse, and under a claim of ownership, and title also directly adverse to that of Stark, and the statute oflimitations would undoubtedly have run in favour of such a possession. The court, it will be perceived, were divided in opinion.